

**SIGNED this 30 day of January, 2008.**

_____
**Marcia Phillips Parsons**
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF TENNESSEE

In re
    LIBERTY FIBERS CORPORATION          No. 05-53874
    f/k/a Silva Acquisition Corporation,          Chapter 7

              Debtor.

### M E M O R A N D U M

Appearances:

| | |
|---|---|
| Mark S. Dessauer, Esq. | Maurice K. Guinn, Esq. |
| Hunter, Smith & Davis, LLP | Gentry, Tipton & McLemore, PC |
| Post Office Box 3740 | 900 South Gay Street, Suite 2300 |
| Kingsport, Tennessee 37664 | Knoxville, Tennessee 37902 |
| *Attorney for MPLG, LLC* | *Attorney for Maurice K. Guinn, Trustee* |

**Marcia Phillips Parsons, United States Bankruptcy Judge**. This chapter 7 case is before the court on the request of MPLG, LLC for payment of administrative expenses pursuant to 11 U.S.C. § 503(b)(1)(A) and the Trustee's objection to the request. For the reasons discussed hereafter, the request will be denied.

I.

The debtor Liberty Fibers Corporation ("Debtor") filed for bankruptcy relief under chapter 11 on September 29, 2005. An order converting the case to chapter 7 was entered shortly thereafter on November 21, 2005. Maurice Guinn was appointed chapter 7 trustee ("Trustee"). As set forth in the parties' stipulations, at the time of the bankruptcy filing, the Debtor owned numerous assets, including a rayon manufacturing plant and a waste water treatment plan and related facilities ("WWTP"), located on a site in Lowland, Tennessee. The Trustee continued to operate the WWTP after the bankruptcy case's conversion, not only for the benefit of the estate but also for the benefit of other entities on site, who paid the estate for the waste water treatment services.

On August 25, 2006, the Trustee entered into a purchase agreement with J & N Salvage, providing for J & N's purchase of certain assets of the Debtor to be salvaged by J & N ("Purchase Agreement"). Subsequently, J & N assigned its interest in the Purchase Agreement to A & E Salvage, Inc. ("A & E"). This court entered an order on September 21, 2006, approving the proposed sale. The Purchase Agreement provided that between the sale's closing date and October 6, 2008, the purchaser would dismantle and remove all purchased equipment from the estate's real property located in Lowland, Tennessee, with the cost of removing the assets to be borne by the purchaser. Expressly excluded from the purchase was the estate's real property, the WWTP and related equipment, and any underground lines/sewers. The consideration for the purchase was $3 million, payable in installments over a twenty-month period beginning October 2006. In a separate agreement, the Trustee granted A & E an option until April 30, 2008, to purchase the real property upon which the salvaging operations were to take place, although the option has not yet been exercised.

Shortly after the sale to A & E was approved, A & E began dismantling and removing the purchased assets from the estate's real property. In its dismantling operations, A & E uses water brought on-site by the City of Morristown at A & E's request, although there was testimony in a separate adversary proceeding before this court that A & E has no need of water in its salvaging operations and the parties have stipulated to this fact. The waste water created by A & E's use flows through a series of sewers located on the estate's real property to the WWTP where it is

treated prior to its discharge to the Nolichucky River. The Trustee billed A & E for its use of the WWTP but A & E refused to pay. The Trustee has filed suit against A & E to collect the sums owed and a trial date for that action has been set.

In March 2007, the Trustee sold the WWTP to MPLG, LLC, which then took over the operation of the facility. After the sale, A & E continued to generate waste water in connection with its dismantling operations, with the waste water continuing to flow through the estate's sewer lines to the WWTP where it is automatically treated. MPLG has made demand on A & E to cease using the WWTP or to pay for the waste water treatment services provided, but A & E has refused. A & E could discontinue sending water to the WWTP by simply turning off its water. However, it has not done so and continues to send water to the WWTP for treatment. A & E takes the position that the bankruptcy estate is responsible for the cost of treatment since the estate continues to own the land on which the salvaging operations are taking place. The parties have stipulated that as long as A & E continues to generate waste water, there is no feasible way to stop the flow of water from A & E's operations without interrupting the flow of water from other users of the WWTP.

In its request for payment of administrative expense presently before the court, MPLG maintains the bankruptcy estate is responsible for the cost of waste water treatment services provided to A & E. According to MPLG, waste water treatment services supplied to A & E "are actual and necessary costs of preserving the bankruptcy estate and enable the generation of cash and related benefits for the estate." Through July 2007, these services totaled $22,003.91 and continue at the rate of approximately $4,503.54 monthly. In his objection to the request for administrative expenses, the Trustee responds that these are obligations of A & E and that the estate has no liability for the services provided to A & E.

II.

Section 503(B)(1)(A) of the Bankruptcy Code provides for the allowance of administrative expenses including the "actual, necessary costs and expenses of preserving the estate." Administrative expenses are granted first priority of distribution under the Code in order "to encourage the provision of goods and services to the estate, and to compensate those who expend new resources attempting to rehabilitate the estate." *In re Pulaski Highway Express, Inc.*, 57 B. R.

3

502, 505 (Bankr. M.D. Tenn. 1986) (citing *In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir. 1984)). In this regard, the Sixth Circuit Court of Appeals has adopted the "well-accepted 'benefit of the estate' test, which states that a debt qualifies as an 'actual, necessary' administrative expense only if (1) it arose from a transaction with the bankruptcy estate and (2) directly and substantially benefitted the estate." *In re Sunarhauserman, Inc.,* 126 F.3d 811, 816 (6th Cir. 1997) (citations omitted). "The 'benefit of the estate' test limits administrative claims to those where the consideration for the claim was received during the post-petition period." *Id.*

The claimant has the burden of demonstrating entitlement to an administrative expense priority by a preponderance of the evidence. *In re HNRC Dissolution Co.*, 343 B.R. 839, 843 (Bankr. E.D. Ky. 2006). In addition, "[t]he claimant must demonstrate that the benefit is more than a speculative or potential benefit." *Id.* (quoting *In re Kmart Corp.*, 290 B.R. 614, 621 (Bankr. N.D. Ill. 2003)). "A debt is not entitled to administrative expense priority treatment simply because the right of payment arise post-petition; the claimant must demonstrate the benefit that inured to the estate." *Id.* The Sixth Circuit has observed that "[s]ection 505 priorities should be narrowly construed in order to maximize the value of the estate preserved for the benefit of all creditors." *In re United Trucking Serv., Inc.*, 851 F.2d 159, 164 (6th Cir. 1988).

MPLG maintains that its administrative expense claim arises from a transaction with the bankruptcy estate in two respects. First, MPLG cites the Purchase Agreement between A & E and the Trustee under which the estate will receive $3 million from A & E. MPLG argues that A & E is utilizing the services of the WWTP in order to perform under the Purchase Agreement and that therefore MPLG's transaction with the bankruptcy estate arises directly from the Purchase Agreement. Second, MPLG references the fact that the water from A & E's salvaging operations flows through sewer lines on estate property to the WWTP. According to MPLG, this creates a transaction between MPLG and the estate.

As to the direct and substantial benefit of the estate requirement essential to establishing an administrative expense, MPLG again refers to the payments the Trustee is receiving from A & E under the Purchase Agreement, arguing that the availability of waste water treatment services assists A & E in salvaging the assets which generates the funds it needs to pay the Trustee. MPLG also

maintains that without the services of the WWTP, the Trustee's ability to sell the estate's assets would have been impaired. Alternatively, MPLG argues that it is not necessary for it to establish benefit to the bankruptcy estate, citing the Supreme Court's decision in *Reading Co. v. Brown*, 391 U.S. 471 (1968), wherein the Court held that administrative expenses include "costs ordinarily incident to operation of a business." *Reading*, 391 U.S. at 483. Using this analysis, MPLG asserts that waste water treatment is a cost ordinarily incident to salvaging operations such as A & E's.

In response, the Trustee denies that MPLG's treatment of A & E's waste water arises from a transaction with the bankruptcy estate and states that to the contrary, the undisputed facts establish that the transaction is solely with A & E. According to the Trustee, he "has never entered in a transaction with MPLG where he has requested MPLG to treat A & E's wastewater." The Trustee notes that as set forth in the stipulations, A & E produces the waste water in connection with its salvage operation from facilities controlled by it; the produced waste water enters the WWTP through lines used by A & E; and the resulting obligation is that of A & E.

With regard to whether the debt directly and substantially benefits the bankruptcy estate, the Trustee responds that the direct benefit is for A & E: it is A & E's waste water that is being treated at the WWTP, not the estate's. The Trustee states that even if it could be argued that there is value to the estate by virtue of having the water treated and not remaining on the estate property, such benefit is speculative at best.

This court agrees with the Trustee and concludes that MPLG has failed to meet either requirement of the Sixth Circuit's "benefit to the estate" test for administrative expenses. Regarding the first factor that the debt arise from a transaction with the bankruptcy estate, the undisputed facts establish the contrary. As the Trustee observes, there has never been a request by the Trustee that MPLG treat A & E's waste water. The fact that A & E's waste water enters the WWTP from sewer lines on the estate's property does not establish the required nexus since the estate does not produce the waste water. There is no evidence that the Trustee requested A & E to generate the waste water or that A & E is producing the waste water on the estate's behalf. *Cf. In re United Trucking Serv., Inc.*, 851 F.2d at 161-62 (Court noted that as an alternative to the transaction with the estate requirement, a claimant may prove that the claimant gave consideration to the estate. However "a

5

creditor provides consideration to the bankrupt estate only when the debtor-in-possession induces the creditor's performance and performance is then rendered to the estate."); *In re Economy Lodging Sys., Inc.*, 226 B.R. 840, 847 (Bankr. N.D. Ohio 1998) (post-petition services performed by consultant disallowed as administrative expense where debtor did not urge or induce consultant to continue its services).

MPLG's argument that the transaction with the estate is established by the terms of the Purchase Agreement because A & E is utilizing the services of WWTP in order to perform under the Purchase Agreement is not supported by the facts of this case. The parties have expressly stipulated that even though A & E is using water on-site, "A & E has no need of water in its salvaging operations." (Stipulation No. 31.) And, the fact that the estate is receiving $3 million from A & E does not create a transaction between MPLG and the estate, since there is no requirement in the Purchase Agreement that A & E use water in its dismantling process or otherwise utilize the services of the WWTP.

Nor do the waste water treatment services provide a direct and substantial benefit to the estate. The Purchase Agreement is clear that "the cost of removing the [Purchased] Assets shall be borne by the Buyer." (Section 6.7(b) of Purchase Agreement, Exh. 1 to Stipulations.) Although no express mention is made of waste water treatment services, Section 9.1 of the Purchase Agreement provides: "Except as set forth in this Agreement . . . , each Party shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the Transaction." Based on these provisions, there is simply no basis for the assertion that a cost incurred by A & E in connection with its dismantling process is a liability of the estate.

As to MPLG's argument that the Trustee's ability to sell the estate's assets would have been impaired without the services of the WWTP, such a contention appears purely speculative. There is no evidence that A & E relied on the availability of waste water treatment services in agreeing to purchase assets from the estate or that such services affected its decision in any way.

The Trustee does concede that an argument could be made that there is value to the estate because A & E's waste water is being treated and discharged into the Nolichucky River rather than remaining on estate property. The court, however, agrees with the Trustee's assertion that such a

benefit is speculative at best. In light of the narrow construction required for priorities, it can not be said that this benefit meets the necessary directness and substantiality required by the Code.

Lastly, the court turns to MPLG's argument based on the *Reading* decision. The Sixth Circuit did observe in *Sunarhauserman* that the "*Reading* line of cases has created an exception to the benefit of the estate requirement for claims for costs ordinarily incident to the operation of a business," but found the exception inapplicable to the case before it because the liability at issue did not arise post-petition. *In re Sunarhauserman,* 126 F.3d at 817. It was not clear from *Sunarhauserman* whether the *Reading* holding creates an exception to the entire benefit-of-the-estate test, or just the second factor, that there be a direct and substantial benefit to the estate. However, from this court's review of the cases applying the *Reading* holding, not a single case has been located that permitted the allowance of an administrative expense when the transaction was not with the estate or where the "costs ordinarily incident to the operation of a business" applied to the operation of a business other than by the estate. Absent such precedent, and again, in recognition of the principle that priorities are to be "narrowly construed and sparingly granted," *see In re Jamesway Corp.*, 202 B.R. 697, 706 (Bankr. S.D.N.Y. 1996), this court refuses to extend the *Reading* exception to the costs of operating a business other than the estate's under the facts of this case.

Moreover, the *Reading* exception has generally been limited to "cases involving claims arising from trustees' negligence, compensatory penalties for violations of injunctions and compensatory penalties for cleanup of environmental hazards." 4 *Collier on Bankruptcy* ¶ 503.06[3][c] (15th ed. rev. 2008). *Reading* involved a claim arising from the post-petition negligence of a receiver [in a Chapter XI case under the former Bankruptcy Act]. *In re Sunarhauserman,* 126 F.3d at 816 (citing *Reading*, 391 U.S. at 483). The Court held therein that "considerations of fundamental fairness and logic" required administrative priority for this claim, a cost ordinarily incident to operation of a business, reasoning that costs arising from the operation of the debtor post-petition should be allocated to the pre-petition creditors, the intended beneficiaries of the debtor's rehabilitation. *Id*.

In the present case, there has been no allegation of misconduct by the Trustee or harm caused

7

by his liquidation activities. While arguably A & E's waste water could be viewed as a potential environmental hazard absent its treatment, it must be remembered that A & E's use of water on the estate's property is solely voluntary on A & E's part: water use is not contemplated by the Purchase Agreement nor is it necessary for the dismantling and removal of assets from the estate's property. Because the estate has not created the need for waste water treatment and is not directly benefitting from A & E's operations, neither "logic" nor "fundamental fairness" supports allocating to creditors of the bankruptcy estate the cost of the waste water treatment provided to A & E. *See In re Hemingway Transport, Inc.* 954 F.2d 1, 5 n.5 (1st Cir. 1992) (stating that application of the *Reading* rationale in the context of an ordinary, nonoperating liquidation proceeding "appears extremely problematic" because one of the fundamental justifications for the priority is that unsecured creditors benefit from the postpetition operation of the debtor's business).

### III.

For the forgoing reasons, the court will enter an order consistent with this memorandum opinion denying MPLG's request for administrative expenses.

# # #